### STRANG v. CITY OF NEW YORK.

(Supreme Court, Special Term, Nassau County. December 10, 1910.)

1. WATERS AND WATER COURSES (§ 87*)—DIVERSION—EQUITABLE RELIEF.
   To warrant equitable relief because of defendant's change of a water course, the evidence should be clear.

   [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 87.*]

2. WATERS AND WATER COURSES (§ 107*)—DIVERSION—EVIDENCE—SUFFICIENCY.
   Evidence *held* insufficient to show that water taken by a municipal waterworks system lowered the water beneath plaintiffs' lands, thus defeating their right to recover damages.

   [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 107.*]

Suits by John H. Strang, by Henry Calvert, by John H. Bedell, by Adam Gaenger, by Frederick Wieners, by Clara Byrne, by Jacob Wiebel, and by Henry Ultsch against the City of New York. Complaints dismissed.

Stephen M. Hoye (Roger Foster and Joseph K. Field, of counsel), for plaintiffs.

Archibald R. Watson, Corp. Counsel (Edward S. Malone and Thomas Garrett, Jr., of counsel), for defendant.

PUTNAM, J. Plaintiffs sue in equity for alleged damages through loss of water taken by the Brooklyn waterworks system from the southern part of Nassau county. They charge that the withdrawal of the large volume of water at the defendant's pumping stations af-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fects the surrounding country, so that the level of underground saturation or the "water table" beneath plaintiffs' farms is lowered, reducing the moisture of the soils, making their lands dry, sterile, and unproductive. The complaints also allege the drying up of a pond, stream, or well upon the respective lands in controversy. As a further cause of action, ownership is claimed of the water drawn away from plaintiffs' farms, which defendant has taken and conveyed to various consumers in Brooklyn, from whom defendant has received large sums as water rents, charges, and assessments for the sale of such water taken and appropriated from the lands of plaintiffs, for which it is prayed that the city of New York should account as trustee. Injunctions are asked, unless the city shall pay plaintiffs' damages as they may be ascertained.

About 50 years ago the former city of Brooklyn began to draw its water supply from outlying wells. Along the southern slope of Long Island is an extensive body of subterranean water, percolating through coarse gravel beds. In the districts of Wantagh and Massapequa, which are here concerned, the first pumping method was by driven wells, which began about 1896. Later resort was had to what was known as the "infiltration gallery system," formed by first excavating a ditch running about east and west to a depth of 30 or 35 feet, into which were set 36-inch earthen pipes, with joints left open, so as to take in water at about the sea level. This excavation was then covered, leaving only surface manholes. At the middle are large wells, from which the pipe galleries lead in each direction on a grade of about 2½ feet to the mile. The underground water percolates through these open joints, entering from bottom, sides, and top, flowing thence by gravity to these wells, which supply the present pumping stations.

At the southeastern part of Nassau county, approaching the Suffolk county boundary, two galleries, quite independent of each other, were run along the line of the Montauk Division of the Long Island Railroad. The westerly one, about 12,000 feet in length, is termed the "Wantagh Infiltration Gallery," from which the city started to pump on May 22, 1905. The easterly gallery (partially a double line of pipe), in all about 18,000 feet long, is the "Massapequa Gallery," whence city pumping began in the following December. Prior to the completion of these galleries, pumping from temporary stations was carried on by the contractors to keep the excavations free; but this water was cast out on the ground to the north and south of the galleries.

Upon some 15 of these suits being called for trial, certain plaintiffs appeared not to own the fee of the lands claimed to be damaged, but were interested as lessees only. Following Sposato v. City of New York (75 App. Div. 304, 78 N. Y. Supp. 168; Id., 178 N. Y. 583, 70 N. E. 1109), these lessees were held not entitled to injunctive relief, and their causes were not heard, whereupon counsel proceeded with the trial of the eight suits entitled as above, which were heard and argued together.

The location of the lands in question is shown on the subjoined diagram. All are farm lands, except the house and lot of Mrs. Byrne

DIAGRAM OF PLAINTIFFS' LANDS.

| | Plaintiff | Distance from Nearest Gallery | No. of Acres | Damages |
|---|---|---|---|---|
| 1. | Strang ........... | 12,500 ft. (Wantagh).......... | 31 | $16,652.00 |
| 2. | Calvert .......... | 16,560 ft. (Massapequa) ....... | 30 | 13,483.50 |
| 3. | Bedell .......... | 11,700 ft. " ....... | 36 | 17,719.60 |
| 4. | Gaenger ........ | 11,460 ft. " ....... | 25 | 8,941.66 |
| 5. | Wieners ......... | 11,060 ft. " ....... | 65 | 86,889.00* |
| 6. | Byrne ........... | 9,120 ft. " ....... | 5 | 1,622.50 |
| 7. | Wiebel .......... | 8,400 ft. " ....... | 24 | 28,800.00 |
| 8. | Soper ........... | 8,100 ft. (Wantagh).......... | 70 | 2,400.00 |
| 9. | Ultsch .......... | 5,280 ft. (Massapequa) ....... | 3½ | 19,320.00 |
| | | | Total, | $195,828.26 |

*Including also damages claimed on parcel of 142 acres held under a tax-title.

The damages shown are only those stated as sustained at date of beginning suits. Fu-ture damages based on loss in yearly rental value are also demanded.

and the small grove of Henry Ultsch. The distances from the galleries, and the damages claimed, are also given. This subterranean water is the surplus from the rainfall which, descending through surface soil, forms this body of ground water, which continues seaward through the sands and gravels, in a slow-moving sheet or column, from 100 to 150 feet thick, advancing at a velocity varying from 15 inches to 100 feet per day. If a pump reaches this underflow, and takes out sufficient water, the level of underground saturation about the pump will be lowered, and this lowering of the surrounding water table is called the "cone of depression." Where, instead of a driven well, a gallery extends across the line of underflow, the neighboring depression takes the form of an inclined plane, or curved surface, with its lower edge near the gallery level. The galleries here in question were laid 10 or 15 feet below the natural water table. Considering the situation of the Wantagh and Massapequa galleries, the effect of large water withdrawals therefrom must obviously be felt to the south, between the galleries and the bay.

At and beyond the plaintiffs' farms, however, the surface of the underflow dips in a varying slope to the southward, probably not exceeding 12 to 15 feet to the mile, and, according to plaintiffs' expert, as flat as 6 or 7 feet a mile nearer the shore. The lowering of the northern water table by the galleries—and how far such gradient of depression reaches—obviously depends on exact measurements of the ground water height at different distances inland.

Plaintiffs' evidence has tended to show: (1) Alleged falling off in crops, indicating a drying of the soil; (2) in a few cases, injury to trees; and (3) loss of surface water shown by differences of streams and the lowering of farm wells.

1. The testimony of the farmers engaged in market gardening discloses an artificial condition, due to liberal, and sometimes excessive, use of fertilizers, resulting in a crop production beyond the normal. The alleged shortages and resultant losses set forth as damage figures were mostly afterthoughts, not estimated at the time, but calculated after the harvest returns had been balanced against the long struggle and outlay of successive market-gardening seasons. As they reviewed the period of about five years since these galleries were operated, they were ready to find in the operations of the city a cause for their losses. The figures of receipts and income since 1905 are made up mostly from recollection, transient memoranda, from wagon sales at Wallabout Market, with the outlays from some receipted bills. Many of these estimates are but approximations. Yet, after making allowances for these items that are inaccurate, as made up from uncertain recollection, it appears that, since 1906, there has been a falling off in some crops on most of the farms. Many plaintiffs admitted that they continued from year to year to grow a large acreage of potatoes, trusting to liberal use of fertilizers to restore the elements taken from the soil. Hence wide variances in the comparative yield per acre appear in the different farms in the same years. The standard of normal potato yield claimed by many plaintiffs is 90 to 100 barrels per acre, which, with a light, sandy soil, is obviously a high and difficult average to be maintained. On the other hand, Mr. Gaenger, whose farm is but a

little over two miles from the gallery, frankly said that in ordinary weather the soil "will do"; also that some of his crops are plentiful, with the important admission that his farm had as much water in 1910 as when he went to it in 1906. Indeed, his yield of corn, wheat, and potatoes in 1909 showed gain over the season of 1908.

Granting, however, that farming operations of the other plaintiffs do show 'deficient yields in 1908, a direct cause is the phenomenally low rainfall of that season—only 34.44 inches, said to be the lowest since 1864. Another reason why the plaintiffs naturally recall better crops before the infiltration galleries is that the average yearly rainfall of 1900 to 1904, inclusive, is 48.82 inches, while the last five years, 1905 to 1909, show but 41.64, a surprising difference of 7.18 inches —enough to account for large losses in vegetation in lands exposed to the summer conditions of evaporation which prevail on Long Island. Furthermore, the use of highly stimulating fertilizers produces unnatural soil conditions, that call for more moisture to dissolve and assimilate their elements, so that this loss of rainfall would be more harmful in market gardening by such methods than in ordinary farming.

2. The evidence as to trees was confined to a relatively small number of fruit and shade trees on the different farms. Some of these trees showed evidences of scale and other pests. None appeared to have received the spraying and care of modern orchards. It was also established that tree growth is so dependent upon rainfall that the rings in the trunk added each year will be relatively narrower in the seasons of small rainfall; at least, if the deficiency comes in the growing months between April and October. Hence, the evidence as to the arrested growth, blight, and decline of trees upon the plaintiffs' farms does not necessarily point to any effects from defendant's pumping.

3. The testimony as to the disappearance of surface water in ponds and streams: Such a stream on the Soper farm was the subject of controversy; but the weight of evidence indicates that it has not disappeared, though doubtless is less in volume than six years ago. There appears also to be a duck pond on the place of varying depth at different seasons of the year. Proof of such changes of water course should be clear, especially if equitable relief is claimed. Jeffers v. Jeffers, 107 N. Y. 650, 14 N. E. 316.

It would be unprofitable to review in detail the evidence as to other streams and their condition now as compared with that in 1905. While many may be reduced, the proofs do not show that any considerable stream has wholly dried up. Such shrinkage as appears is not beyond what might naturally be expected, in view of the diminished rainfall following the higher average before 1905.

In view, however, of the principles declared in the Reisert Case (69 App. Div. 302, 74 N. Y. Supp. 673; Id., 174 N. Y. 196, 66 N. E. 731, and 101 App. Div. 93, 91 N. Y. Supp. 780), the court has considered all evidence by test well readings and theoretical opinion therefrom upon the issue whether defendant's galleries have injuriously withdrawn water from plaintiffs' lands.

Defendant's experts do not deny that the pumping from the galleries

does affect the water table to the north; but the admission is that the depression thereby caused extends only about 3,500 feet to the north of the gallery. Since these claims were filed with the city, local test wells have been driven along the roads extending out past the plaintiffs' farms, and readings from soundings in them have been kept by observers and entered into registers produced in evidence. Plaintiffs' expert in their direct case maintained by ingenious reasoning that the lowering of the water table at the gallery would create an inclined surface, extending back indefinitely, so that a second lower water table would·be formed, tending to become parallel to the higher natural water table. His theoretical opinion was that, in the four years since the galleries had·been in operation, such change had already extended back, so as to lower the water table under the most distant of plaintiffs' farms.

An examination of many test wells, the readings of which have been compared, does not bear out this view. A wide fluctuation in each well appears between the highest and the lowest yearly readings, which would be expected in view of the marked differences in rainfall. The influence of this pumping might show itself in three different ways. It might be indicated by the fluctuations of the depths in the same well at different dates, or in tabulating the highest well readings during the·years in question, or by comparing the variations of the lowest yearly readings along a line of wells near the lands claimed to be affected. If a draining off to the south existed, then it should show in the low levels, and the lowest, as presumably indicating all depleting influences upon the water table, should prove plaintiffs' cases.

But these lower levels of the water in the test wells, while showing slight declines, are very uniform, and fail to disclose any substantial lowering of slope. A study of the more distant wells shows so little reduction from year to year since 1908, when they were driven, as to forbid the conclusion that the slope was running down in the local water table. Indeed, careful analysis of these readings, in connection with rainfall and other local influences, showed the variations to be insignificant. At the plaintiffs' request, the original field books were produced to test these registered readings by the primal entries made at the wells. Considering that the ground water represents what is left from the rainfall after the direct absorption by crops and vegetation, and that this watershed has been lately under increasing cultivation and clearing up of lands, which affect water in the soil, local declines in the yearly minima of a foot or two could not be regarded as abnormal.

·After testimony had proceeded several days, with full opportunity to study the data presented, plaintiffs' expert candidly admitted that these well records did not support his first opinions, which he then revised. Finally, on the last day of the trial, plaintiffs' expert urged that from these galleries the city was taking more than the estimated quantity proportioned to the rainfall extending over this watershed. The actual amounts received, from Massapequa, Wantagh, and Matowa (the pumping station next west), from galleries, ponds, and driven wells, thus including all sources of local supply, has been, in 1906, 13.47 billion gallons; 1907, 14.48 billion gallons; 1908, 15.29 billion gallons;

1909, 14.39 billion gallons. The boundary of the watershed depends on the location of the ground water summit, as well as the territory laterally drained, which are both indeterminate, from which the area is merely estimated at about 70 square miles. Referring to certain formulas proportioning stream flow to rainfall, plaintiffs' expert urged that the figures of actual receipts of water greatly exceeded the results of his calculated proportions. This later reasoning is based on two assumptions:

First, that out of the entire rainfall upon these 70 square miles, a precise determination of the surface "stream flow" can be reached, and that, during these five years, this is 14 per cent., although, obviously, such an arbitrary proportion must vary as the year's rainfall is heavy or light; in fact, in years of minimum rainfall, the stream flow is taken as low as 9 per cent.

Second, that the city gets this surface stream flow only through the ponds as a source of supply, ignoring the many small streams flowing near the galleries; that, because these three ponds did not furnish 14 per cent., an overdraft on the galleries is to be inferred; that such an excess drawn from the galleries has the effect to deplete the ground water table.

Such estimates are too vague to form a basis for judicial findings. The records, however, do clearly show aggregate quantities of water taken and of rainfall upon which a finding can be made. During the last five years, the whole rainfall over this tributary watershed was 311.6 billion gallons, of which the city took 80.5 billion, or only 25.8 per cent. According to a consensus of authority, going back to 1854, this proportion cannot be called excessive; and it does not appear that taking this water has harmed plaintiffs.

The studies of plant life and the vertical range of capillarity, with the influence of osmosis carrying moisture to the roots of plants (so elaborately gone into at the trial), need not be dealt with, because the court finds that the defendant's pumping, or conduct of its water system, has not been shown by a preponderance of evidence to have produced any substantial lowering of the water beneath the plaintiffs' lands, and that, therefore, no damages have been established.

The complaints are therefore dismissed, with costs.