In the Matter of the Application of the CITY OF NEW YORK to Acquire Certain Real Estate at Wantagh, in the Town of Hempstead, County of Nassau, for Purposes of Water Supply.

Second Department, July 25, 1913.

Waters and watercourses — conveyance of pond and mill site to city for water supply purposes — right of subsequent grantee of land below said pond to the overflow.

A deed conveying a pond and mill site to the city of New York, pending a proceeding by it to condemn lands for water purposes and to acquire an easement "to draw down the streams and ponds," and waters of any description as shown upon a map, duly filed, after referring to said map, stated the boundaries so as to include all of the pond except the shallows on the eastern margin and then contained a habendum clause giving with the land all "ponds, springs, stream water rights, mill rights and privileges." Pending the erection of a pumping plant, the grantor was given the rights of boating, fishing, gunning and taking ice from the pond for his domestic use, so long as said rights did not interfere with the purposes for which the city had acquired the pond. The grantor also reserved a qualified right to continue his mill and machinery for three years, and to use such water as the city might not find necessary to take for its own use. In case the city should build a pumping station on the pond before the expiration of three years, the grantor was to receive a certain sum in addition, as consideration. Some time after the execution of this deed swamp land below the pond was excavated, so that when the grantor of the pond transferred such swamp land to one B. there was a pleasure pond of fresh water thereon, supplied by the overflow from the pond conveyed to the city. After the city commenced to operate its infiltration galleries much of the overflow from the pond deeded to the city ceased, and B. was left to depend upon a salt water supply for his pond.

In a claim by B. for compensation for the stoppage of the surface flow from the city's water works, *held*, that B. took his title to the lower lands with the excavations thereon, charged with full knowledge of the rights and easements of the city under the deed of his grantor, by which the city could draw down the waters of the pond, even to the

extent of diverting and exhausting the overflow therefrom, and that he should not receive compensation because his pond was deprived of waters originating in the pond conveyed to the city, but an award for the city's easement to draw down streams and other waters on his lands should be affirmed.

APPEAL by Edwin H. Brown, claimant, from an order of the Supreme Court, made at the Kings County Special Term and entered in the office of the clerk of the county of Nassau on the 16th day of June, 1911, confirming the report of commissioners of appraisal, and also from the report of said commissioners.

*Theodore N. Ripsom* [*Robert Bach* with him on the brief], for the appellant.

*John B. Shanahan* [*James D. Bell* and *Archibald R. Watson* with him on the brief], for the respondent.

PUTNAM, J.:

This is a proceeding to condemn land and to acquire an easement " to draw down the streams and ponds " and waters of any description, as shown upon a map duly filed. The territory to be affected was in Wantagh in the town of Hempstead, to the south of the " infiltration gallery," between the Merrick road and Great South bay — a district of approximately three square miles in area. This appeal is by Mr. Edwin H. Brown as owner of about one hundred and sixteen acres, in which is an artificial fresh water pond, originally of about twenty-one acres. Mr. Brown's title is through deed from one Jacob S. J. Jones, who in 1885 also owned an adjoining tract, above what is now the Brown estate. This upper tract lay between the Babylon turnpike, now the Merrick road, and the Long Island railroad; it included an artificial mill pond of about eighty-five acres, composed of smaller pools and formed by the waters of the Jerusalem brook and the West brook. This pond was retained by a dam at the Babylon turnpike.

Since 1884 the former city of Brooklyn and its successor, the city of New York, had been taking water from along the south shore of Long Island by pumping stations and driven

wells. In January, 1885, it had started proceedings to condemn lands for water supply purposes in this locality, and filed a map entitled "The General Map of Lands, Etc., intended to be taken and entered upon for the purpose of acquiring additional lands and the extinguishment of additional water rights with a view of increasing the water supply of the City of Brooklyn, pursuant to resolution of the Common Council of said City passed January 19th, 1885."

Mr. Jones's pond was a favorable site for a city pumping station. Near the dam was a mill from which the overflow escaped into a swamp or salt marsh, also then owned by Mr. Jones, but in 1902 conveyed to this appellant. The city purchased this pond and mill site from Mr. Jones by conveyance on August 7, 1885. The proposed pumping station was expected to take about three years to erect, and the deed gave Mr. Jones certain rights to run his mill in this interval. After referring to the map filed in the condemnation proceedings, the deed stated the boundaries by compass courses and measurements, so as to include all the Jones pond except the shallows on the eastern margin. Some additional uplands on the west side, between the turnpike and Hogs Head road, not specifically included in the description, were also granted. The conveyance had this habendum:

"Together with all and singular the tenements hereditaments ponds springs stream water rights mill rights and privileges, and rights and easements to take dirt gravel etc from land on the south side of said Turnpike for the repair of the Mill dams and appurtenances thereunto belonging or in any wise appertaining and the reversion and reversions remainder and remainders rents issues and profits thereof."

The instrument was a bargain and sale deed, with the usual full covenants.

Pending erection of the expected pumping plant Mr. Jones was given the rights of boating, fishing, gunning and taking ice from this pond for his domestic use, "said privileges to be continued however only as long as they are not found by the party of the second part, or its Department of City Works to interfere with the proper maintenances or keeping of the pond and to be revoked by the said Department of City Works or its

successors whenever their exercise shall be found in any way detrimental."

The shallow margin of the pond above mentioned, beyond the east purchase line, might be filled in by Mr. Jones " at his own expense whenever he may wish to do so: and that the said party of the second part may have on the other hand a similar right: but that whether such additional filling may or may not be made by either party the party of the first part relinquishes all water and Mill rights."

Mr. Jones also reserved a qualified right to continue his mill and machinery for three years and to use such water " as the party of the second part may not find necessary to take for its own use according to the judgment and in the discretion of its Commissioner of the Department of City Works or his successors. Said privileges however shall not debar the party of the second part from the right to draw down the pond while constructing its Water Works North of the Railroad if it shall be deemed necessary to drain said works during construction."

After expiration of three years the city was to be entitled to charge a rental for the mill site and for the use of the surplus water for mill purposes, with a preference in such renting to Mr. Jones, if it should decide to rent the same. If it decided not to rent, then Mr. Jones was to remove his mill and machinery at his own cost. In case, however, the pumping station on the pond should be built and operated before the three years, Mr. Jones was to receive $500 in addition to the consideration hereinbefore expressed.

Sometime after this deed the swamp land below the Merrick road was excavated, so that in February, 1902, when Mr. Brown took his title, there was on his estate a pleasure pond of fresh water about four feet deep supplied by the •overflow from the Jones pond. Mr. Brown did not feel any inconvenience in the lack of water for his pond until the infiltration galleries were operated in 1905, when much of the flow from the Jones pond ceased and the bottom became exposed so that Mr. Brown was left to depend on a salt water supply for his pond. He, therefore, sought compensation for this stoppage of the surface flow from the city's water works at the Jones pond.

This brings us to the scope and effect of this conveyance in 1885 in view of the attending circumstances, especially the condemnation proceedings started. What did the city acquire? Was it only the user of the water of the Jones pond, as appurtenant to the land, limited to a reasonable enjoyment thereof, such as a riparian owner ordinarily has, or did the city obtain the right to take, divert and consume those waters so as to exhaust all its overflow if required for its municipal water supply?

The right here involved of the lower proprietor was not a claim to percolating subterranean waters but to the living stream overflowing from the upper pond in a watercourse running into his adjacent marsh land. Such a right, as against diversion and impairment by pumping or other appropriation of the surface water above, had always been judicially recognized. (*Van Wycklen* v. *City of Brooklyn*, 118 N. Y. 424.)

In 1909 the condemnation commissioners reported adversely to the city. They stated as reasons for their conclusion, (a) that as the Jones pond had been made from natural streams, the overflow of which ran on to Great South bay, it could not be presumed that Mr. Jones meant to cede and extinguish his lower riparian rights; (b) that the infiltration gallery, installed twenty years after, was not then thought of; and (c) the rights of the city were incomplete, since its boundary did not take all of the West brook, but only to the middle line, by which it acquired but half that stream.

After hearing at Special Term this report was rejected and the matter sent back. The second report, here confirmed, awarded to Mr. Brown for the city's easement to draw down streams and other waters on his land $9,500, but, as directed at Special Term, excluded any compensation for his pond as deprived of waters and springs originating in the Jones pond.

Upon this appeal Mr. Brown urges that the city took only the water rights naturally appurtenant to the grant to it — a right to use the water — and not to take and divert its entire volume.

The title and easements granted were not to use the power or passing flow of this pond. The municipal purpose was to appropriate and conduct away for consumption not to be

returned, the *corpus* of the pond, or so much thereof as the city should judge necessary for its purposes.

The grant purported to vest in the city officials the discretion as to how much water it should take and appropriate. It was contemplated that the municipality might draw down the pond so that the mill would not turn, since that eventuality was to form the consideration for the additional $500, if this happened within the three-year period of Mr. Jones's continued occupancy. The public objects disclosed by the condemnation proceedings add weight and effect to the habendum, to have with the land "ponds springs stream water rights mill rights and privileges."

Such an absolute taking for sale and consumption negatived any lower riparian right, the essence of which is that all water so used be returned in quantity substantially undiminished, in the ordinary channel, as it leaves the first estate. (3 Kent's Com. 439.) All these rights of such riparian proprietors were then vested in Mr. Jones, the city's grantor. He understood the grant he gave. As was said by MELLISH, L. J.: "It is quite plain (indeed, I do not know that it is disputed) that the diversion of the water of a stream for the purpose of sending it in large quantities to a reservoir to supply a town is not within the right of a riparian proprietor." (*Wilts and Berks Canal Nav. Co.* v. *Swindon Waterworks Co.*, L. R. 9 Ch. App. 451, 461.)

Mr. Jones, at the same time owner of the mill pond and of the entire course of its overflow to the bay, conveyed and granted this right to divert, appropriate and consume, at the city's discretion, and to conduct its pumping to the point of absorbing all overflow and discharge. After such an unqualified grant the appellant, who stands in the shoes of the grantor, could not assert any riparian rights as to the waters so appropriated and consumed. (*New England Cotton Yarn Co.* v. *Laurel Lake Mills*, 190 Mass. 48.) Such a second pool to be fed and maintained from the overflow of the upper pond then sold, if contemplated, required an exception or reservation in the grant.

No doubt the increased efficiency of the water withdrawals through operation of the infiltration galleries was not then in

mind, but these galleries were but a lateral extension of the usual pumping from wells (*Strang* v. *City of New York*, 127 N. Y. Supp. 231), and clearly within the rights conveyed.

In 1885 the Jones pond had long dammed back the two streams which fed it. Although this deed bounded along the thread of the West brook, above the line of pond flowage, it did not leave out any portion of that inflow, after it entered and became incorporated in the pond itself. It was not necessary that the city should also have title to both the tributary streams before they became merged in the waters of its purchase.

When, therefore, in 1902, Mr. Brown, the claimant, took his title to the lower lands, with the excavations thereon, he took it charged with full knowledge of the rights and easements under the deed of his grantor, by which the city could draw down the pond waters even to the extent of diverting and exhausting the southern overflow therefrom, however that might affect the lower estate.

I advise that the order confirming the report be affirmed, with costs.

JENKS, P. J., CARR, RICH and STAPLETON, JJ., concurred.

Order affirmed, with costs.