(158 App. Div. 222.)

### In re WATER SUPPLY OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. July 25, 1913.)

WATERS AND WATER COURSES (§ 156*)—CONVEYANCES—RIGHTS GRANTED.

A deed, which, pending proceedings for condemnation by a city for a water supply, after referring to the map filed in the condemnation proceedings, states the boundaries so as to include all the grantor's pond, except shallows on one margin, has an habendum, to have with the land "ponds, springs, stream, water rights, mill rights and privileges," gives the grantor right to fill said shallows, but provides that, whether or not he does so, he "relinquishes all water and mill rights," reserved to the grantor a right to continue his mill for three years, if the grantee does not sooner complete a pumping station, and to use such water as the grantee may not find necessary to take for its own use, though not including one of the banks of one of the tributary streams, gives the grantee the right to divert and consume the waters of the pond, to the extinguishment of the grantor's lower riparian rights, as owner of the lands on the outlet; and this though the more efficient means of withdrawing the water, finally adopted by the city, are not in mind at the time of the grant.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

Appeal from Special Term, Nassau County.

Application of the City of New York to acquire real estate at Wantagh, in the town of Hempstead, county of Nassau, for purposes of water supply. From an order confirming Commissioners' report, Edwin H. Brown appeals. Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before JENKS, P. J., and CARR, RICH, STAPLETON, and PUTNAM, JJ.

Theodore N. Ripsom, of New York City (Robert Bach, of New York City, on the brief), for appellant.

John B. Shanahan, of Brooklyn (James D. Bell, of Brooklyn, on the brief), for respondent.

PUTNAM, J.   This is a proceeding to condemn land and to acquire an easement "to draw down the streams and ponds" and waters of any description, as shown upon a map duly filed.   The territory to be affected was in Wantagh in the town of Hempstead, to the south of the "infiltration gallery," between the Merrick Road and Great South Bay—a district of approximately three square miles in area. This appeal is by Mr. Edwin H. Brown as owner of about 116 acres, in which is an artificial fresh water pond, originally of about 21 acres. Mr. Brown's title is through deed from one Jacob S. J. Jones, who in 1885 also owned an adjoining tract, above what is now the Brown estate.   This upper tract lay between the Babylon Turnpike, now the Merrick Road, and the Long Island Railroad.   It included an artificial millpond of about 85 acres, composed of smaller pools and formed by the waters of the Jerusalem Brook and the West Brook. This pond was retained by a dam at the Babylon Turnpike.

. Since 1884, the former city of Brooklyn and its successor, the city of New York, had been taking water from along the south shore of Long Island by pumping stations and driven wells.   In January, 1885, it had started proceedings to condemn lands for water supply purposes in this locality, and filed a map entitled the "General Map of Lands, Etc., intended to be taken and entered upon for the purpose of acquiring additional lands and the extinguishment of additional water rights with a view of increasing the water supply of the City of Brooklyn, pursuant to resolution of the Common Council of said City passed January 19, 1885."

Mr. Jones' pond was a favorable site for a city pumping station. Near the dam was a mill from which the overflow escaped into a swamp or salt marsh, also then owned by Mr. Jones, but in 1902 conveyed to this appellant.   The city purchased this pond and mill site from Mr. Jones by conveyance on August 7, 1885.   The proposed pumping station was expected to take about three years to erect, and the deed gave Mr. Jones certain rights to run his mill in this interval.   After referring to the map filed in the condemnation proceedings, the deed stated the boundaries by compass courses and measurements, so as to include all the Jones pond except the shallows on the eastern margin.   Some additional uplands on the west side, between the turnpike and Hogs Head. Road, not specifically included in the description, were also granted.   The conveyance had this habendum:

"Together with all and singular the tenements hereditaments ponds, springs, stream, water rights, mill rights and privileges, and rights and easements to take dirt gravel etc. from land on the south side of said turnpike for the repair of the milldams and appurtenances thereunto belonging or in any wise appertaining and the reversion and reversions remainder and remainders rents issues and profits thereof."

The instrument was a bargain and sale deed, with the usual full covenants.

Pending erection of the expected pumping plant, Mr. Jones was given the rights of boating, fishing, gunning, and taking ice from this pond for his domestic use, "said privileges to be continued, however, only as long as they are not found by the party of the second part, or its department of city works, to interfere with the proper maintenances or keeping of the pond and to be revoked by the said department of city works or its successors whenever their exercise shall be found in any way detrimental."

The shallow margin of the pond above mentioned, beyond the east purchase line, might be filled in by Mr. Jones "at his own expense whenever he may wish to do so; and that the said party of the second part may have on the other hand a similar right; but that whether such additional filling may or may not be made by either party the party of the first part relinquishes all water and mill rights."

Mr. Jones also reserved a qualified right to continue his mill and machinery for three years, and to use such water "as the party of the second part may not find necessary to take for its own use according to the judgment and in the discretion of its commissioner of the department of city works or his successors. Said privileges, however, shall not debar the party of the second part from the right to draw down the pond while constructing its waterworks north of the railroad if it shall be deemed necessary to drain said works during construction."

After expiration of three years, the city was to be entitled to charge a rental for the mill site, and for the use of the surplus water for mill purposes, with a preference in such renting to Mr. Jones, if it should decide to rent the same. If it decided not to rent, then Mr. Jones was to remove his mill and machinery at his own cost. In case, however, the pumping station on the pond should be built and operated before the three years, Mr. Jones was to receive $500 in addition to the consideration hereinbefore expressed.

Some time after this deed, the swamp land below the Merrick Road was excavated, so that in February, 1902, when Mr. Brown took his title, there was on his estate a pleasure pond of fresh water, about four feet deep, supplied by the overflow from the Jones pond. Mr. Brown did not feel any inconvenience in the lack of water for his pond, until the infiltration galleries were operated in 1905, when much of the flow from the Jones pond ceased, and the bottom became exposed, so that Mr. Brown was left to depend on a salt-water supply for his pond. He therefore sought compensation for this stoppage of the surface flow from the city's waterworks at the Jones pond.

This brings us to the scope and effect of this conveyance in 1885, in view of the attending circumstances, especially the condemnation proceedings started. What did the city acquire? Was it only the user of the water of the Jones pond, as appurtenant to the land, limited to a reasonable enjoyment thereof, such as a riparian owner ordinarily has; or did the city obtain the right to take, divert, and consume these waters, so as to exhaust all its overflow, if required for its municipal water supply?

The right here involved of the lower proprietor was not a claim to percolating subterranean waters, but to the living stream overflowing from the upper pond in a water course running into his adjacent marshland. Such a right, as against diversion and impairment by pumping or other appropriation of the surface water above, had always been judicially recognized. Van Wycklen v. City of Brooklyn, 118 N. Y. 424, 24 N. E. 179.

In 1909, the condemnation commissoners reported adversely to the city. They stated as reasons for their conclusion: (a) That as the Jones pond had been made from natural streams, the overflow of which ran on to Great South Bay, it could not be presumed that Mr. Jones meant to cede and extinguish his lower riparian rights; (b) that the infiltration gallery, installed 20 years after, was not then thought of; and (c) the rights of the city were incomplete since its boundary did not take all of the West Brook, but only to the middle line, by which it acquired but half that stream.

After hearing at the Special Term, this report was rejected and the matter sent back. The second report, here confirmed, awarded to Mr. Brown for the city's easement to draw down streams and other waters on his land, $9,500, but, as directed at Special Term, excluded any compensation for his pond as deprived of waters and springs originating in the Jones pond.

Upon this appeal Mr. Brown urges that the city took only the water rights naturally appurtenant to the grant to it—a right to use the water, and not to take and divert its entire volume.

The title and easements granted were not to use the power or passing flow of this pond. The municipal purpose was to appropriate and conduct away for consumption, not to be returned, the corpus of the pond, or so much thereof as the city should judge necessary for its purposes.

The grant purported to vest in the city officials the discretion as to how much water it should take and appropriate. It was contemplated that the municipality might draw down the pond so that the mill would not turn, since that eventuality was to form the consideration for the additional $500, if this happened within the three-year period of Mr. Jones' continued occupancy. The public objects disclosed by the condemnation proceedings add weight and effect to the habendum, to have with the land "ponds, springs, stream, water rights, mill rights and privileges."

Such an absolute taking for sale and consumption negatived any lower riparian right, the essence of which is that all water so used be returned in quantity substantially undiminished, in the ordinary channel, as it leaves the first estate. 3 Kent's Com. 439. All these rights of such riparian proprietors were then vested in Mr. Jones, the city's grantor. He understood the grant he gave. As was said by Mellish, L. J.:

"It is quite plain (indeed, I do not know that it is disputed) that the diversion of the water of a stream for the purpose of sending it in large quantities to a reservoir to supply a town is not within the right of a riparian proprietor." Wilts & Berks Canal Nav. Co. v. Swindon Waterworks Co., L. R. 9 Ch. App. 451, 459.

Mr. Jones, at the same time owner of the millpond and of the entire course of its overflow to the bay, conveyed and granted this right to divert, appropriate, and consume, at the city's discretion, and to conduct its pumping to the point of absorbing all overflow and discharge. After such an unqualified grant, the appellant who stands in the shoes of the grantor, could not assert any riparian rights as to the waters so appropriated and consumed. N. E. Cotton Yarn Co. v. Laurel Lake Mills, 190 Mass. 48, 76 N. E. 231. Such a second pool to be fed and maintained from the overflow of the upper pond then sold, if contemplated, required an exception or reservation in the grant.

No doubt the increased efficiency of the water withdrawals through operation of the infiltration galleries was not then in mind; but these galleries were but a lateral extension of the usual pumping from wells (Strang v. City of New York [Sup.] 127 N. Y. Supp. 231), and clearly within the rights conveyed.

In 1885, the Jones pond had long dammed back the two streams which fed it. Although this deed bounded along the thread of the West Brook, above the line of pond flowage, it did not leave out any portion of that inflow, after it entered and became incorporated in the pond itself. It was not necessary that the city should also have title to both the tributary streams before they became merged in the waters of its purchase.

When, therefore, in 1902, Mr. Brown, the claimant, took his title to the lower lands, with the excavations thereon, he took it charged with full knowledge of the rights and easements under the deed of his grantor, by which the city could draw down the pond waters even to the extent of diverting and exhausting the southern overflow therefrom, however that might affect the lower estate.

I advise that the order confirming the report be affirmed, with costs. All concur.