(163 App. Div. 37)

### LOWNDES v. HUNTINGTON WATERWORKS CO.

(Supreme Court, Appellate Division, Second Department. June 26, 1914.)

EMINENT DOMAIN (§ 300*)—TAKING PROPERTY WITHOUT CONDEMNATION—RIGHTS OF LANDOWNER.

In an action against a waterworks company to restrain it from diverting underground supply to complainant's ponds, evidence *held* to require a finding that the maintenance and operation of defendant's wells and pumping station was the proximate cause of the depletion of complainant's supply, and that complainant was entitled to damages, in the absence of proceedings by defendants to condemn a right to such water.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 811–814; Dec. Dig. § 300.*]

Appeal from Special Term, Suffolk County.

Action by Allison E. Lowndes against the Huntington Waterworks Company. From an interlocutory judgment adjudging defendant liable for diverting underground water by its pumping system, and directing a reference to ascertain damages in case defendant took no proceedings for condemnation, it appeals. Affirmed.

Argued before JENKS, P. J., and BURR, RICH, STAPLETON, and PUTNAM, JJ.

Rowland Miles, of Northport, for appellant.
Frederick H. Sanborn, of New York City, for respondent.

PUTNAM, J. This suit, for damages by the drying of plaintiff's pleasure ponds in Huntington village, is upon the ground that by defendant's system of wells and pumps it has depleted the sources of the underground water supply for plaintiff's ponds.

At the bottom of a narrow valley a small stream, known as Meeting House brook, ran northerly and emptied into Huntington Harbor. Before 1867, this was in a springy swamp; the land also being watered from flowing springs in the uplands along the sides. Dams on this stream had made a succession of artificial ponds as early as 1867. In 1870 these ponds were stocked with trout. The fact that for many years—indeed, up to 1910—trout were here successfully bred, was offered to prove that the waters must have been cold, and therefore fed

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from underground springs. In 1894 and 1896, plaintiff acquired this property. In 1904 he caused the ponds to be cleared of the surrounding bushes and undergrowth, and deepened them, and in 1906 he erected a further dam below, making five ponds in all.

About 180 feet to the south of the nearest of these ponds, and in an upstream direction therefrom, defendant operated its pumping plant. It began with two driven wells in 1893. In 1904 it sank two more, adding one yearly in 1905, 1906 and 1907, making seven wells. They are ranged about 10 or 15 feet apart, in a row, extending across this valley. The suctions from the pumping are operated from them all, taking in water about 50 feet below the surface through perforations at the lowest 12 feet of these driven wells.

The requirements of the increasing population of Huntington have taken more water each year. The average daily consumption of about 42,000 gallons in 1896 had risen in 1905 to about 100,000 gallons. The increase since that time appears from the following figures of daily averages:

| 1906 | .....................................................108,923 gallons |
|------|---------------------------------------------------------------------|
| 1907 | .....................................................119,815    " |
| 1908 | .....................................................131,613    " |
| 1909 | .....................................................151,853    " |
| 1910 | .....................................................187,804    " |

These averages extend through the year, although the consumption is greater in the summer. In these five years the plaintiff's ponds have diminished. Mr. Williams, who had lived near by, testified that before 1906 he had never seen any of these ponds empty. Before 1906 the ponds had steadily overflowed. After the dams and sluiceways had been raised in 1906, and the ponds deepened 10 inches or a foot, the water continued to overflow as before. In 1907 this overflow had about stopped as early as Decoration Day, and later that year the water in the ponds gradually sank for about a foot or 10 inches. This reduction was greater the following year (1908), so as to uncover the bottoms of some of the ponds. In 1909 they dried up still more. In 1910 this shrinkage showed by June 1st, which increased during that season, exposing much of the bottoms of the ponds, as is made clear by photographs.

On July 18, 1910, the present suit was begun to restrain defendant from this withdrawal of subterranean water. The proximity of defendant's pumping station, and the admitted volume of water taken, naturally suggest an effect upon these neighboring ponds. Defendant, however, says that its withdrawals are from a lower water stratum, far under the level of these ponds, and that therefore its pumps do not affect the percolating water near the surface, whence the ponds are supplied.

The under soil of Long Island for the most part is permeable by water. The extent of a great water-bearing stratum of wet gravels, or a "water table," is the source of the present water supply of the borough of Brooklyn. The porous sand and gravels readily allow the flow of underground waters. But water does not penetrate clay beds. Occasionally an extensive lateral clay or hardpan deposit is found in-

terposed between gravel strata, which takes and holds the rain descending into the subsoil, so as to make a raised water table above this impervious clay. Such a raised layer of water-bearing gravel, held and bottomed on a clay deposit, is called a "perched" water table.

The defendant contends that the water supplying defendant's ponds, which are shallow, comes from such a perched water table, and not from the main water table out of which defendant draws its supplies. But no such perched water table was found. No such hardpan, or clay deposit, was shown to exist.

In November, 1910, test wells sunk near these ponds were regularly sounded, and a connection established between the well levels and defendant's pumping. On November 21st, preparatory to cleaning out its reservoir, defendant pumped but three hours, and had not pumped at all the night before. This cessation was followed by a reappearance of water in plaintiff's pond No. 1. Light pumping ensued, and water then remained in the ponds. On November 23d regular pumping was resumed. On the morning of the 24th no water appeared in the plaintiff's ponds. This was in the midst of a long drought, and seems to show a causal connection between the defendant's pumping and the drying of the defendant's ponds. The water levels in the test wells also established that the height of water declined as the line of test wells approached defendant's pumping station—showing a slope or line of depression as they come nearer to defendant's wells—a recognized mark of the effect of deep pumping upon the surrounding zone of saturation. This proof, being uncontradicted, does establish that the effect of defendant's pumping affects the water levels under and about defendant's ponds.

Defendant, however, points out that in these years when plaintiff's ponds have lost volume the rainfall has diminished, which may be a competent cause. See Strang v. City of New York (Sup.) 127 N. Y. Supp. 231. But the falling off in the ponds is manifested early each year in May, before the periods of summer drought. No doubt the low precipitation of 1908 and 1909 had its effect; but if the plaintiff's pumping, when stopped two days, is followed in the midst of summer drought by the waters reappearing in the ponds, such pumping, rather than failure of rain, must be regarded, as found by the Special Term, to be the primary and direct cause. Defendant's suggestions that the ponds let the water out through increased seepage after they had been cleaned out, and a loss of water by that taken up by the increased vegetation after the grounds had been cultivated, do not overcome plaintiff's proofs.

When defendant stopped its pumps, water appeared in the ponds. When pumping was resumed, the pond again was dry; and, as the pumping went on, the water levels in the surrounding test wells sank, and these levels were found to be lower as the wells were located nearer to the pumping plant. This puts the effect of defendant's pumping out of the field of speculation.

The court at Special Term committed no error, and I advise that the judgment be affirmed, with costs. All concur.